**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MYLES REHANA and BRIGID SCHULLERTS,** | § | |
| | § | |
| ***laintiffs*,** | § | **CIVIL ACTION NO. 4:26-cv-238** |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **ARLINGTON INDEPENDENT SCHOOL DISTRICT** | § | |
| | § | |
| | § | |
| ***efendant*.** | § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiffs Myles Rehana and Brigid Schullerts ("Plaintiffs"), by and through their attorneys, brings this action for damages and other legal and equitable relief arising from Defendant ARLINGTON INDEPENDENT SCHOOL DISTRICT's ("Defendant") unlawful surveillance, acts of discrimination, and retaliation, and in support shows the following:

## INTRODUCTION

1. This is an action brought by Plaintiffs seeking damages from Defendants for secret audiotaping of the Plaintiffs in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2520, and constitute an invasion of privacy by intrusion upon their private affairs.

2. Plaintiffs' also bring this action seeking damages for acts of discrimination based on disability and retaliation caused by Defendant. Defendant's acts of discrimination and retaliation are in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112 *et seq*., the Texas Employment Discrimination Act, as amended, Tex. Lab. Code §§ 21.001 *et seq.* ("TLC"), and any other cause(s) of action that can be inferred from the facts set forth herein.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, which provides district courts with jurisdiction over civil actions arising under the United States Constitution or laws of the United States. The federal rights asserted by Plaintiffs are enforceable under 18 U.S.C. § 2520 and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C.§ 2201; and (iii) 42 U.S.C. § 1981 *et seq*., as amended.

4. This Court also has personal jurisdiction over Defendant according to the State of Texas' long-arm statute and the Defendant's minimum contacts with Texas that arise out of or relate to Plaintiffs' experiences of disability discrimination and retaliation

5. This action is authorized and instituted pursuant to § 107(a) of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12117(a), which incorporates by reference § 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3), and pursuant to § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

6. This Court also has subject matter jurisdiction to adjudicate the supplemental state law claims that arose out of the same course of conduct giving rise to the principal claims of Plaintiff as stated below, pursuant to 28 U.S.C. § 1367.

7. Finally, this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(l) as well because: (a) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (b) there is complete diversity between Plaintiffs and Defendant.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the real and immediate harm sustained by Plaintiff occurred in this judicial district.

## PARTIES

9. Plaintiff Myles Rehana is a citizen of and currently resides in the State of Texas.

10. Plaintiff Brigid Schullerts is a citizen of and currently resides in the State of Texas.

11. Defendant Arlington Independent School District is a school district located in Arlington, Texas.

12. During all relevant times, Defendant engaged in an industry affecting commerce and had 15 or more employees.

## STATEMENT OF FACTS

**A. Plaintiffs' Electronic Communications Privacy Act Claims.**

13. On or about January 8, 2024, Plaintiff Brigid Schullerts commenced full-time employment as a Security Corporal with Defendant.

14. On or about February 13, 2024, Plaintiff Myles Rehana commenced full-time employment as a Security Corporal with Defendant.

15. Plaintiff Rehana's normal work hours were from 3:00 p.m. to 11:30 p.m. Starting in mid-November 2024, he was assigned to a night shift of 11:00 p.m. to 7:30 a.m.

16. Plaintiffs' primary job duty was to patrol and inspect all of the 80 campuses owned and operated by Defendant, in the company vehicle and on foot, inspecting the facilities, including checking exterior doors and other entry points, inspecting intrusion alarm system control panels, motion detectors and fire suppression system alarm panels, and responding to fire and burglary alarms as assigned by the company dispatch. Discrepancies and concerns were documented.

17. Plaintiffs' job duties required that they spend the majority of their tour of duty in a vehicle owned by Defendant, typically Chevrolet pick-up trucks.

18. Unbeknownst to Plaintiffs, every vehicle that they were required to drive for Defendant had an audio recording device implanted within.

19. Plaintiffs were never made aware by Defendant verbally or in writing that their voices were being recorded by an audio device whenever they were in a company vehicle.

20. At times during their tours of duty Plaintiff Rehana and Plaintiff Schullerts would speak with each other on their cell phones on speaker mode or through the Bluetooth connection of the company vehicle.

21. During the course of Plaintiff Rehana's employment, he was subjected to unwelcome sexual comments, "banter" and innuendo by a co-worker, Security Corporal Le'Anna Haynes, and his immediate supervisor, Patrol Lieutenant Jayne Rodriguez.

22. Plaintiff Rehana and Corporal Haynes drove the same company vehicle. They had daily contact during the overlap of their shifts at the security compound, when Corporal Haynes would hand over the vehicle keys and brief Plaintiff Rehana on anything of importance for his upcoming shift.

23. The sexually harassing conduct of Ms. Haynes began in May 2024.

24. Ms. Haynes would touch Plaintiff Rehana on his shoulders and arms.

25. Ms. Haynes told Plaintiff Rehana, "I can't wait to see those legs."

26. On May 27, 2024, Ms. Haynes sent Plaintiff Rehana a text that said, "This is me whistling really loudly in anticipation of seeing those legs woohoo."

27. In August 2024, Plaintiff Rehana and Plaintiff Schullerts each emailed the former Director of Security regarding concerns they had about the safety protocols of Plaintiff Rehana's then-supervisor, Sergeant William Krivit.

28. In October 2024, Lt. Rodriguez became Plaintiff Rehana's supervisor. Lt. Rodriguez commenced making unwelcome sexual comments to Plaintiff Rehana.

29. For example, in late October or early November of 2024, Plaintiff Rehana was being fitted for a bulletproof vest at Defendant's headquarters office. Lt. Rodriguez was sorting through the vests to see which one would fit Plaintiff Rehana, asked Plaintiff Rehana to model a vest, and said he looked good in uniform. Lt. Rodriguez said that Plaintiff Rehana should let her take pictures of him.

30. Plaintiff Schullerts learned about and sometimes observed the sexual harassment on the job experienced by Plaintiff Rehana.

31. On numerous occasions, Plaintiff Rehana would discuss the unwelcome sexual conduct he was experiencing on the job in phone calls with Plaintiff Schullerts. Plaintiff Rehana and Plaintiff Schullerts would each be in their company vehicles. At times profanity was used in the context of these conversations.

32. At times, Plaintiff Schullerts' job duties resulted in her accompanying Plaintiff Rehana in his company vehicle, or he would have to accompany her in her company vehicle.

33. During November and December 2024, Plaintiff Rehana and Plaintiff Schullerts would discuss the unwelcome conduct that Plaintiff Rehana was experiencing, first from his co-worker, Corporal Haynes, then from Patrol Lieutenant Rodriguez.

34. Plaintiff Rehana had pre-existing conditions of a panic disorder, anxiety disorder and depression.

35. The unwelcome comments and touching he experienced on the job increased his anxiety. He did not feel he could bring up the conduct to management. He began having panic attacks.

36. Plaintiff Rehana, in phone calls from his vehicle, and in person when Plaintiff Rehana and Plaintiff Schullerts were in the vehicle together, informed Plaintiff Schullerts of the mental anguish that he was experiencing due to the harassment.

37. Plaintiff Schullerts observed the mental toll of the sexually hostile work environment experienced by Plaintiff Rehana.

38. In her company vehicle, in person and by phone, Plaintiff Schullerts encouraged Plaintiff Rehana to report the harassment to Defendant to try to get it stopped.

39. On December 9, 2024, Michael Nunley, Security Fleet Manager, told Plaintiff Schullerts that everything she said in the company vehicle could be heard. He played a recording of Plaintiff Schullerts inside her vehicle where she was speaking on her cell phone with a co-workers who was working in Dispatch.

40. Shocked, Plaintiff Schullerts told Plaintiff Rehana, by phone from her company vehicle, that they were being continuously recorded by audio at work. Plaintiff Rehana was in his company vehicle at the time of her call. Plaintiffs discussed the illegality of this secret recording and considered the manner in which it would be appropriate to report this invasion to someone outside of their employer.

41. The revelation that he had been subjected to secret audio recording by his employer since his date of hire weighed heavily on Plaintiff Rehana. The secret recording and the continuing subjection to sexual harassment, which he felt reluctant to report, worsened his anxiety symptoms, depression and panic attacks.

42. On December 16, 2024, Plaintiff Rehana informed management that he needed to take emergency medical leave.

43. He returned to work from medical leave on December 24, 2024.

44. On or about December 24, 2024, Defendant required Plaintiffs, for the first time, to sign a form acknowledging that they were was being recorded by the Defendant's "Samsara" application built into the vehicle.

45. Defendant's subjection of Plaintiffs to secret and illegal audio recording in their company vehicles was intentional.

46. Defendant's secret recording of the voice and conversations of Plaintiffs on the job was highly offensive.

47. This intrusion of the Plaintiffs' privacy by Defendant was unreasonable, unjustified and unwarranted.

48. Students attending Defendant's schools would regularly approach Plaintiffs in their vehicles at their and discuss matters through the driver's side window if Plaintiffs needed to talk to the student regarding safety or security concerns. Similarly, students would approach the vehicles with their own safety or security concerns. The right to privacy of these AISD students, whose conversations were close enough to be recorded by Defendant, was similarly an invasive intrusion, especially exploitative given that they were minors.

49. Defendant, concerned about Plaintiffs' monitored discussion of the Defendant's illegal conduct regarding implanted recording devices, as well as their discussions and reports of sexual harassment by two employees, including a supervisor, began subjecting the Plaintiffs to adverse terms and conditions of their employment.

50. For example, for over two months after returning from his medical leave, Plaintiff Rehana was not allowed by Defendant to return to his regular job patrolling the campuses, despite the fact that he no longer had any medical restrictions. Instead he was kept at a desk job in Dispatch.

51. Similarly, Plaintiff Schullerts was kept off her Patrol job by Patrol Lieutenant Jayne Rodriguez in December 2024 and kept on a desk job in Dispatch. Defendant was aware that Plaintiff Schullerts had disabilities, including migraine headaches, back disabilities, and an anxiety disorder, all related to her military service. The Dispatch assignment exacerbated her back pain and increased her episodes of migraine headaches, all from being forced to sit and stare at camera footage for her entire shift at this desk job.

52. Plaintiff Rehana has a back disability resulting from his military service.

53. The desk position he was transferred to led his back disability to worsen. He felt severe pain from being forced by Defendant to sit at his job all day, rather than the varying duties inspecting campuses in the security job for which he was hired.

54. On March 7, 2025, Defendant put Plaintiffs on unpaid leave for a purported investigation about alleged misconduct. The nature of the purported investigation and misconduct was never revealed to either Plaintiff.

55. On March 14, 2025, Plaintiff Schullerts, specifically described to Defendant's Employee Relations Director and COO Hill the sexual harassment that Plaintiff Rehana had been subjected to by Corporal Haynes and Patrol Lieutenant Rodriguez. She used explicit details, including the contents of text messages she had seen, behavior she had witnessed, and phone calls Lieutenant Rodriguez had made to Plaintiff Rehana from her office phone about which Plaintiff Rehana had confided to Plaintiff Schullerts. In the meeting with HR and the COO, Plaintiff Schullerts noted that other co-workers had witnessed the sexually harassing behavior of Haynes and Patrol Lieutenant Rodriguez and had ridiculed Plaintiff Rehana for it. Plaintiff Schullerts informed HR and COO Hill that she had kept records of what had occurred.

56. In the meeting, it became obvious that Plaintiffs' conversations by phone and in their vehicles together had been monitored by Defendant.

57. Michael Hill, Chief Operations Officer (COO) of Defendant, specifically asked Plaintiff Schullerts if she used profanity at work.

58. COO Hill specifically asked Plaintiff Schullerts what she knew about the Samsara application.

59. Plaintiff Schullerts replied that she knew all Defendant's security employees had been lied to about the system in that they were not informed they were being recorded by audio mode.

60. Being on an indefinite period of unpaid leave resulted in bills and other financial obligations mounting for both Plaintiffs.

61. Being on an indefinite period of unpaid leave resulted in anxiety, loss of enjoyment of life, mental anguish and depression for Plaintiffs.

62. Ultimately, Plaintiffs, after several weeks without pay and with no end of the forced unpaid leave in sight, were constructively discharged from their employment in April 2025.

63. Each sought unemployment insurance benefits. The state unemployment benefit agency found each had been discharged by Defendant, and not for reasons of misconduct.

**B. Plaintiff Rehana's Disability and Retaliation Claims.**

64. Plaintiff Rehana suffers from anxiety, including panic attacks, and radiculopathy (back disability).

65. On December 16, 2024, Plaintiff Rehana disclosed to his supervisor, Sergeant Steven Villalobos, that he was experiencing worsening anxiety symptoms and panic attacks and would need to take emergency medical leave.

66. Plaintiff Rehana took Temporary Disability Leave from December 16, 2024 to December 23, 2024, which Defendant approved. During his leave, Plaintiff Rehana saw his physician and was prescribed Hydroxyzine, which improved his symptoms of anxiety. The Hydroxyzine was a short-term, limited prescription for 10 days use only.

67. On December 23, 2024, Plaintiff Rehana submitted the necessary paperwork regarding his Temporary Disability Leave request to his supervisor Sergeant Steven Villalobos. This paperwork included a Fitness-For-Duty certification signed by his physician, which stated that Plaintiff Rehana "may begin with dispatch service and may advance to patrol if experiencing no side effects such as drowsiness from hydroxyzine use."

68. When Plaintiff Rehana returned to work on December 24, 2024, he was told by Lieutenant Jayne Rodriguez that he could return to work and that he would be assigned to dispatch until January 6, 2025 or until he was approved to return to patrol.

69. Plaintiff Rehana's dispatch assignment required that he be seated for long periods of times without standing, which exacerbated his back condition. Accordingly, after working in dispatch for several days, Plaintiff Rehana began experiencing significantly worsening back symptoms.

70. On January 12, 2025, Plaintiff Rehana requested a reasonable accommodation from the HR Leaves Department. Specifically, Plaintiff Rehana requested that Defendant return him to patrol and remove him from dispatch because the sedentary requirements of dispatch exacerbated his back disability.

71. On January 22, 2025, Plaintiff Rehana sent a detailed complaint to Human Resources James Fickens, and a request that he be taken off dispatch and returned to patrol as a reasonable accommodation because the sedentary nature of the dispatch job was worsening the

symptoms of his back disability. The return to patrol was consistent with his physician's recommendation on the Fitness for Duty form dated December 23, 2024, which said Rehana should return to patrol if experiencing no side effects from the hydroxyzine.

72. From January 22, 2025 to February 14, 2025, Plaintiff Rehana repeatedly complained to Sgt. Villalobos that he was being denied a reasonable accommodation for his back disability by being forced to work in dispatch.

73. Then, on February 14, 2025, Plaintiff Rehana received an email from Lt. Rodriguez, asking if Plaintiff Rehana had submitted an update to HR Leaves on his restriction status, even though Plaintiff Rehana had repeatedly stated that he no longer needed the accommodation of remaining in dispatch because he was no longer taking the hydroxyzine.

74. On February 15, 2025, Plaintiff Rehana informed Mr. Fickens that he intended to submit a complaint to the EEOC and TWC.

75. On February 20, 2025, Plaintiff Rehana submitted a Charge of Discrimination with the EEOC (Charge No. 450-2025-04281). Rehana informed Fickens that he had filed the EEOC charge and to ask about the status of his work restrictions.

76. That same day, HR Leaves requested Plaintiff Rehana submit an updated Fitness for Duty Sheet.

77. On February 27, 2025, Plaintiff Rehana submitted the updated Fitness for Duty Sheet in which his physician said he was allowed to return to patrol with no restrictions.

78. On or around March 4, 2025, Lt. Rodriguez told Plaintiff Rehana he would be placed back on patrol without restriction starting on March 7, 2025.

79. However, he was never returned to patrol. On March 7, 2025, Plaintiff Rehana was placed on District Initiated Leave without pay due to "allegations involving alleged misconduct."

During the meeting to discuss the allegations, Plaintiff Rehana was told the allegations were for "an inappropriate relationship" and job performance by Executive Director of Employee Relations and Development Dollorress Johnson. However, Ms. Johnson refused to provide further details.

80. Upon information and belief, the allegations of misconduct were initiated as a result of allegations submitted to HR by Lt. Rodriguez.

81. During that meeting, Plaintiff Rehana complained that he believed he was being retaliated against for reporting discrimination and filing a Charge of Discrimination with the EEOC.

82. While on unpaid suspension, Defendant requested Plaintiff Rehana attend a meeting regarding "issues with security." During this meeting, on March 14, 2025, no issues with security were raised. Plaintiff Rehana told Leslie Perez, HR Representative, that he felt this meeting was in retaliation for Plaintiff Rehana filing a charge with the EEOC.

83. Following this meeting, Plaintiff Rehana was not paid and did not hear from AISD for several weeks. Accordingly, Plaintiff Rehana applied for unemployment benefits with the TWC.

84. On April 14, 2025, Plaintiff Rehana's application for unemployment benefits was approved. The TWC Determination Letter concluded that Plaintiff Rehana had been terminated for an incident "not considered misconduct connected with the work."

85. That same day, Defendant submitted an appeal of the decision to the TWC and a hearing was set for April 28, 2025.

86. However, on April 23, 2025. Mr. Fickens emailed Plaintiff Rehana informing him that he was required to attend a meeting with Defendant the next day. Plaintiff Rehana did not attend the meeting because he believed he was no longer an employee of Defendant.

87. On April 28, 2025, the TWC hearing was held and Plaintiff Rehana's benefits were upheld.

**C. Plaintiff Schullerts Discrimination and Retaliation Claims.**

88. During her employment with Defendant, Plaintiff Schullerts suffered from anxiety and panic attacks. Additionally, during her previous time in the Marine Corps, Plaintiff Schullerts sustained significant, chronic back injuries, including slipped and herniated L4 and L5 discs.

89. On or around December 10, 2024, Plaintiff Schullerts met with Fleet Manager, Michael Nunley, Lt. Juan Aguilar and Lt. Nelson Martinez and disclosed that she had been struggling with anxiety at work. Plaintiff Schullerts sent a follow up email after the meeting reiterating her struggles with anxiety.

90. On or around December 20, 2024, Plaintiff Schullerts was reassigned to dispatch, where she was required to sit at her desk for the entire shift to monitor cameras. In that position, Plaintiff Schullerts was not allowed to stand up or be away from her desk because the cameras needed constant monitoring. By contrast, in her previous position on patrol, Plaintiff Schullerts walked the property and checked doors, averaging 12,000 to 15,000 steps each shift.

91. As a result of the sedentary dispatch position, Plaintiff Schullerts began to experience extreme back pain and migraines.

92. On December 25, 2024, the pain became so bad that Plaintiff Schullerts was forced to call off her shift. In response, she was told she could return to patrol on January 4, 2025.

93. However, Schullerts was not returned to patrol. Prior to her January 4, 2025 shift, Sgt. Villalobos told Plaintiff Schullerts she may have hit a vehicle while backing up her patrol vehicle. Plaintiff Schullerts was required to submit an accident report, which she completed on Jan. 5, 2025.

94. As a result of the accident with the patrol car, Plaintiff Schullerts was again assigned to dispatch for the rest of January and February 2025.

95. Schullert's sedentary work in dispatch continued to worsen her symptoms of back pain and migraine headaches, eventually becoming so bad that she had to see a chiropractor and physical therapist. Schullert's medical provider told her that the hours of sitting was exacerbating the injuries she had received in the Marine Corps, consisting of slipped and herniated L4 and L5 discs.

96. Plaintiff Schullerts asked Lt. Rodriguez when she could return to patrol. Lt. Rodriguez responded that she was waiting on a hearing document from the Risk Management Department, and as soon as she had it, Plaintiff Schullerts could return to patrol.

97. Around that same time, Plaintiff Schullerts told Sgt. Villalobos that she was receiving medical treatment for back pain and migraines and that her medical provider recommended that she only sit for an hour at a time before being allowed to stand and walk around.

98. On or around February 6, 2025, Plaintiff Schullerts met with Mr. Fickens to request a reasonable accommodation for her back pain and migraines. Plaintiff Schullerts filled out the necessary paperwork and requested medical documentation from medical providers.

99. Shortly after, Lt. Rodriguez told Plaintiff Schullerts she still had not received the necessary hearing document that would allow her to return to patrol.

100. On or around February 25, 2025, Plaintiff Schullerts called the Risk Management department and was told by Tina Baze and her supervisor that there was no investigation into Plaintiff Schullerts and that the hearing document Lt. Rodriguez claimed to be missing did not exist and was not a requirement to return to the patrol position.

101. That same day, Lt. Rodriguez emailed Plaintiff Schullerts and told her she was not

allowed to contact the Risk Management Department. Lt. Rodriguez then told Plaintiff she was approved to go back to patrol on March 7, 2025.

102. However, hours before the March 7, 2025 patrol shift, Plaintiff Schullerts was told that she was being placed on unpaid suspension for purported allegations of misconduct. Like Plaintiff Rehana, Plaintiff Schullerts was not given any more detail about the allegations against her.

103. Upon information and belief this unpaid suspension was a result of allegations submitted by Lt. Rodriguez.

104. On or around April 6, 2025, Plaintiff Schullerts applied for unemployment benefits with the TWC. Her application was approved on April 16, 2025, with a finding by the TWC that Plaintiff Schullerts had been terminated.

105. Shortly after, Defendant appealed, but the appeal was denied with the TWC finding there was no support for the allegations of misconduct.

## CAUSES OF ACTION

### COUNT I
### ELECTRONIC COMMUNICATIONS PRIVACY ACT
18 U.S.C. § 2520
*Disparate Treatment*

106. Plaintiffs incorporate by reference and re-alleges the information set forth above, as if fully set forth herein.

107. At all relevant times herein, 18 U.S.C. § 251 l(l)(a) prohibited the intentional interception of any electronic communications between two parties without the consent of one or both parties to that communication.

108. 18 U.S.C. § 2511 provides that "any person who-(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" shall be punished.

109. Defendant intentionally intercepted Plaintiffs' oral communications, i.e., their phone calls, without their consent, thereby violating§ 251 l(l)(a).

110. 18 U.S.C. § 2520(a) provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity ... which engaged in that violation such relief as may be appropriate."

111. 18 U.S.C. § 2520(b) provides that "[i]n an action under this section, appropriate relief include-(1) such preliminary and other equitable or declaratory relief as may be appropriate; (2) damages under subsection (c) and punitive damages in appropriate cases; and (3) reasonable attorney's fees and other litigation costs reasonably incurred."

112. Under 18 U.S.C. § 2520(c)(2), "the court may assess damages whichever is the greater of- (A) the sum of the actual damages suffered by the Plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000."

113. By reason of the foregoing, as a result of Defendants' conduct described above, Plaintiffs are entitled to recover the maximum allowable statutory damages, punitive damages, and attorneys' fees and costs available under 18 U.S.C. § 2520.

**COUNT II**
**INVASION OF PRIVACY BY INTRUSION**

114. Plaintiffs incorporate by reference and re-alleges the information set forth above, as if fully set forth herein.

115. The interception and disclosure of Plaintiffs' oral communications without their consent constituted an unauthorized intrusion upon Plaintiffs' right to privacy.

116. This intrusion was highly offensive to a reasonable person.

117. The matter upon which the intrusion occurred was private.

118. The intrusion caused anguish and suffering for Plaintiffs.

**COUNT III**
**AMERICANS WITH DISABILITIES ACT**
**(Failure to Accommodate)**

119. Plaintiffs incorporate by reference and re-alleges the information set forth above, as if fully set forth herein.

120. At all relevant times, were qualified individual under the ADA, employed by Defendant.

121. At all relevant times, Defendant has been a covered entity under § 101(2) of the ADA, 42 U.S.C. § 12111(2).

122. Defendant failed to reasonably accommodate Plaintiffs' disabilities by requiring them to remain in sedentary positions in dispatch in violation of Title I of the ADA, 42 U.S.C. § 12112 (b)(5)(A) and 42 U.S.C. § 12111(9), leading to and causing Plaintiffs' termination by Defendant in violation of the ADA.

123. Plaintiffs' requests for relief are set forth below.

**COUNT IV**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000E, *ET SEQ.***
**(Retaliation)**

124. Plaintiffs incorporate by reference and re-alleges the information set forth above, as if fully set forth herein.

125. Plaintiffs engaged in protected activity as that term is defined by Title VII.

126. Defendant retaliated against Plaintiff for engaging in protected activity by, *inter alia*, discriminating against Plaintiffs in the terms and conditions of their employment, denying Plaintiffs' reasonable accommodation requests, and terminating Plaintiffs' employment.

127. Plaintiffs' requests for relief are set forth below.

**COUNT V**
**THE TEXAS EMPLOYMENT DISCRIMINATION ACT, AS AMENDED, TEX. LAB. CODE §§ 21.001 *ET SEQ.***
**(Failure to Accommodate)**

128. Plaintiffs incorporate by reference and re-alleges the information set forth above, as if fully set forth herein.

129. At all relevant times, Plaintiffs have been a qualified individual with a disability under the Texas Employment Discrimination Act and employed by Defendant.

130. Defendant failed to reasonably accommodate the Plaintiffs' disabilities, leading to and causing her termination by Defendant in violation of Tex. Lab. Code § 21.051.

131. Plaintiffs' requests for relief are set forth below.

**COUNT VI**
**THE TEXAS EMPLOYMENT DISCRIMINATION ACT, AS AMENDED, TEX. LAB. CODE §§ 21.001 *ET. SEQ.***
**(Retaliation)**

132. Plaintiffs incorporate by reference and re-alleges the information set forth above, as if fully set forth herein.

133. Plaintiffs engaged in protected activity as that term is defined by the TLC.

134. Defendant retaliated against Plaintiffs for engaging in protected activity by, *inter alia*, discriminating against Plaintiffs in the terms and conditions of their employment, denying Plaintiffs' reasonable accommodation requests, and terminating Plaintiffs' employment.

135. Plaintiffs' requests for relief are set forth below.

## DEMAND FOR JURY TRIAL

136. Plaintiffs demand a jury trial on all matters raised in this Amended Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

A. That the practices of Defendant complained of herein be determined and adjudged to be in violation of the rights of Plaintiffs under the federal and state laws identified above prohibiting discrimination and retaliation in employment;

B. That judgment be entered in favor of Plaintiffs as set forth herein, and against Defendant, for back pay (including interest or an appropriate inflation factor), front pay, benefits and all other amounts owed to Plaintiffs;

C. That Plaintiffs be awarded pecuniary and non-pecuniary compensatory damages for her employment discrimination claims including for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other losses;

D. That Plaintiffs be awarded punitive damages for Defendant's discriminatory practices done with malice or with reckless indifference to the federally protected rights of Plaintiffs;

E. That Plaintiffs be awarded pre-and post-judgment interest;

F. That Plaintiffs reasonable attorneys' fees and costs associated with this matter, including but not limited to expert fees and costs;

G. That Defendant be ordered to require training regarding discrimination based upon disability and retaliation; and

H. That the Court retain jurisdiction over Defendant until such time as it is satisfied

that it has remedied the practices complained of and is determined to be in full compliance with the law.

Plaintiffs further demand that they be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: April 28, 2026

Respectfully submitted,

*/s/ Brian Pounds*
Suzanne M. Anderson
Texas State Bar No. 14009470
sanderson@vkv.law
**VALLI KANE & VAGNINI LLP**
1825 Market Center Blvd,
Dallas, TX 75207
(516) 203-7180 (phone)
(516) 706-0248 (fax)
(214) 797-9021 (cell)

Brian Pounds
Texas State Bar No. 24126432
bpounds@vkv.law
**VALLI KANE & VAGNINI LLP**
11149 Research Blvd, Suite 100
Austin, Texas 78759
Telephone: (737) 808-2263

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2026, a true and correct copy of the foregoing document was served on counsel of record through the Court's ECF System

*/s/ Brian Pounds*
Brian Pounds